## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| KAY PATTESON<br>and GARY PATTESON | ) ) ) ) | |
| Plaintiffs, | ) ) | Case:  1:10-CV-01760<br>Judge James E. Boasberg |
| v. | ) ) ) | |
| JOHN R. MALONEY, M.D., | ) ) | |
| Defendant. | ) ) ) | |

---

### DEFENDANT JOHN MALONEY, M.D.'S MOTION FOR *FRYE* HEARING TO PRECLUDE PLAINTIFF'S EXPERTS' TESTIMONY THAT SEROQUEL CAN CAUSE TARDIVE DYSKINESIA

COMES NOW Defendant, John R. Maloney, M.D., by and through his counsel, Gregory S. McKee and Wharton, Levin, Ehrmantraut & Klein, P.A.,  and hereby files the instant Motion for <u>Frye</u> Hearing regarding the testimony of Plaintiff's experts and treating physician fact witness as to the issue of Seroquel-induced tardive dyskinesia.   In support thereof, Defendant states:

1. This is a complex medical malpractice action involving Defendant's psychiatric treatment of Plaintiff and specifically, Defendant's prescription of the antipsychotic medication Seroquel to Plaintiff during the course of treatment. Plaintiff alleges that as a result of this prescription, she suffered Seroquel-induced tardive dyskinesia.

2. Plaintiff has designated expert witnesses who intend to testify – and have already done so at deposition – that Seroquel can cause tardive dyskinesia.  One of Plaintiff's non-expert treating physicians has also testified at deposition to a

causal link between Seroquel and tardive dyskinesia.

3.  However, Plaintiff's experts' proposed testimony is not sufficiently established to have gained general acceptance in the scientific community and as a result, Plaintiff's experts (and fact witnesses) cannot render a reasonable opinion in this regard.  See Frye v. U.S., 54 App.D.C.46 (1923); Dyas v. United States, 376 A.2d 827, 832 (D.C. 1977).

4.  As Plaintiff's expert's proposed testimony fails the requirements for evidentiary reliability set forth in Frye and Dyas, Plaintiff's experts (and fact witnesses) should be precluded from testifying that Seroquel can cause tardive dyskinesia.

5.  To this end, Defendant respectfully requests a Frye hearing prior to the anticipated testimony of Plaintiff's experts and treating physicians.

6.  Defendant incorporates by reference herein the supporting Memorandum of Points and Authorities filed simultaneously herewith.

WHEREFORE, Defendant John R. Maloney, M.D. respectfully requests that this Honorable Court grant the instant Motion for Frye hearing prior to the testimony of Plaintiff's anticipated experts and fact witnesses regarding the causation question of Seroquel-induced tardive dyskinesia.

Respectfully submitted,

_____/s/ Gregory S. McKee_____
Gregory S. McKee, Esquire (Bar #470474)
Wharton, Levin, Ehrmantraut, & Klein, P.A.
104 West Street, P.O. Box 551
Annapolis, MD 21404-0551
Tel. (410) 263-5900
Fax (410) 263-6583
Counsel for Defendant John R. Maloney, M.D.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15 day of July, 2013, a copy of Defendant John R. Maloney, M.D.'s Motion for <u>Frye</u> Hearing was sent via e-mail and mailed, postage prepaid, to:

Kenneth M. Trombly, Esquire
Daniel Singer, Esquire
Schultz & Trombly, PLLC
1050 17th Street, N.W., Suite 1250
Washington, D.C.  20036
*Counsel for Plaintiffs*

John P. Leader, Esquire
The Leader Law Firm
3567 East Sunrise Drive
Suite 133
Tucson, AZ  85718
*Counsel for Plaintiffs*

Timothy J. Aiken, Esq.
Aiken & Scoptur, SC
2600 North Mayfair Road
Suite 1030
Milwaukee, WI  53226-1308
*Counsel for Plaintiffs*

___*/s/ Gregory S. McKee*___
Gregory S. McKee, Esquire

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KAY PATTESON<br>and GARY PATTESON<br><br>Plaintiffs,<br><br>v.<br><br>JOHN R. MALONEY, M.D.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case: 1:10-CV-01760<br>Judge James E. Boasberg |

## MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF DEFENDANT JOHN MALONEY, M.D.'S MOTION FOR *FRYE* HEARING TO PRECLUDE EVIDENCE REGARDING PLAINTIFFS' ALLEGATION THAT SEROQUEL CAN CAUSE TARDIVE DYSKINESIA

COMES NOW Defendant, John R. Maloney, M.D. ("Defendant"), by and through his counsel, Gregory S. McKee and Wharton, Levin, Ehrmantraut & Klein, P.A., and hereby files the instant Memorandum of Points and Authorities in Support of his Motion for a <u>Frye</u> Hearing to preclude evidence regarding Plaintiff's allegation that Seroquel can cause tardive dyskinesia, and states as follows:

## I.      BACKGROUND

Though the instant motion is styled as motion to preclude, if granted, it will in actuality operate as a dispositive motion, serving as the basis for a motion for judgment as Plaintiff would be prohibited from offering evidence necessary to prove causation. Absent the ability to prove causation, Plaintiff's suit would necessarily fail.

**Statement of Relevant Facts**

This is a complex medical malpractice case involving Defendant's psychiatric treatment of Plaintiff which began when she first presented to Defendant on May 30, 2006. Along with her chief complaints of anxiousness and depression, Defendant noted a significant history of alcohol abuse and dependence. Plaintiff also experienced periods of insomnia associated with her underlying conditions. She was given a working diagnosis of depression, anxiety and alcohol dependence. As a result, Defendant recommended an in-patient rehabilitation clinic for her alcoholism (Plaintiff declined hospitalization for detoxification) and medications which were utilized to treat both the alcohol and depression. Plaintiff also declined outpatient treatment for her dependence issues.

Plaintiff returned to Defendant on June 8, 2006, at which time she stated that she was doing well on her medications but was still having difficulty sleeping. Defendant prescribed Trazodone[1] for her insomnia. On June 22, 2006, Plaintiff again returned to Defendant's office at which time she indicated the Trazodone was ineffective in resolving her insomnia. As an alternative, Defendant placed Plaintiff on Seroquel, a second-generation (atypical) antipsychotic medication, to treat Plaintiff's sleep disorder. Plaintiff continued to see Defendant through the remainder of 2006 and into 2007.

On June 5, 2007, Plaintiff reported to Defendant that she was having some difficulty walking for which she was seeing a neurologist. On August 3, 2007, Plaintiff returned to Defendant's office and reported experiencing muscle spasms. On August 5, 2007, Plaintiff saw her treating neurologist, Dr. Peter Bernad and asked him whether

---

[1] Trazodone is an antidepressant medication that is also commonly prescribed for sleeping disorders.

her neuromuscular difficulties were due to Seroquel; Dr. Bernad was unable to make a Seroquel-induced tardive dyskinesia diagnosis.

Plaintiff ultimately filed the instant law suit, alleging, among other things, that Defendant improperly managed and treated her with the prescription of Seroquel. Specifically, Plaintiff alleged that "[a] reasonably prudent provider of psychiatric medical care would and should have known that 'Tardive Dyskinesia', [sic] a severely debilitating neurologic condition, is a known potential side effect of anti psychotic medications, including Seroquel." Amended Complaint at ¶47, attached hereto as Exhibit 1.  Plaintiff further alleged that as a result of Defendant's prescription of Seroquel to Plaintiff, "plaintiff Ms. Patteson developed and now suffers from tardive dyskinesia."  Id. at ¶48. In short, Plaintiff has alleged that the Seroquel prescribed by Defendant caused her to suffer tardive dyskinesia. [2]

**Seroquel**

In the 1950s, a class of medications referred to as "typical" or "first-generation" antipsychotics were developed for the purpose of treating psychosis and other serious mental disorders.   Rak Deposition, attached hereto as Exhibit 2, at 89:19 – 90:17. These "typical" antipsychotics, which included medications such as chlorpromazine, haloperidol and perphenazine, possessed a side effect profile that included the movement disorders EPS (extrapyramidal symptoms) and tardive dyskinesia.[3]  Id. at 91:15 – 92:9.  As a result of the common and serious nature of these side effects, the medical field recognized the need to develop a new type of antipsychotic medication

---

[2] There is question as to whether Plaintiff actually suffered from tardive dyskinesia.  However, as that issue is a question of fact, it will not be addressed in the instant Motion.
[3] "EPS relates to motor or movement related manifestations that occur early in the course of treating a patient with a medication," whereas tardive dyskinesia is a movement disorder which manifests later in the course of treatment – hence the term "tardive."  Rak Deposition at 20:20 – 21:11.

with an altered chemical makeup that would result in a side effect profile carrying a significantly lower, if not non-existent, risk of movement disorders. Id. at 92:10-20.  The new antipsychotic medications developed are known as "atypical" or "second-generation" antipsychotics.   These second-generation antipsychotics are known as "atypical" because they are not associated with EPS or tardive dyskinesia. Id.  These second-generation antipsychotics include Seroquel which was approved by the FDA in 1997. Id. at 79:6-9.

No scientific methodology has attributed Seroquel to causing tardive dyskinesia. See infra.  There are no medical studies or literature that attribute Seroquel to causing tardive dyskinesia.  See infra.  Any link between Seroquel and tardive dyskinesia is based entirely on conjecture.

## II.      LEGAL STANDARD

### 1.   Plaintiff's Causation Burden

Medical malpractice cases generally require expert testimony on the issue of causation.  See Lasley v. Georgetown University, 688 A.2d 1381, 1384-85 (D.C. 1997) In Lasley, the Court held that "[o]ur rule for medically complicated cases is that proof of causation normally requires medical opinion testimony."  The Court further noted that "in a medical malpractice case, there is the ever-present possibility that it was *the patient's original affliction* rather than the physician's negligence which caused the ultimate damage."  Id. at 1386 (quoting 1 David W. Louisell & Harold Williams, MEDICAL MALPRACTICE § 8.05 at 8-71 (1995)) (emphasis supplied).  Because "a mere temporal coincidence between two events does not necessarily entail a substantial causal relation between them[,]. . .without more, [a] proximate temporal relationship will not

support a finding of causation." Id. at 1387.   In other words, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

      2.     General Causation vs. Specific Causation

      There are two types of causation:   general causation and specific causation. "[G]eneral causation is whether the substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." Merrell Dow v. Havner, 953 S.W.2d 706, 714-15 (Tex. 1997); see also Raynor v. Merrell Pharmaceuticals, Inc., 104 F.3d 1371, 1376 (D.C. Cir. 1997) (discussing general and specific causation); In re Breast Implant Litigation, 11 F.Supp.2d 1217, 1224 (D.Colo. 1998) (holding that a plaintiff must demonstrate "both general and specific causation—that is, that the [alleged causative agent is] capable of causing the conditions complained of, and that the [alleged causative agent was] the cause-in-fact of the specific conditions.").

      3.     Profferor of Expert Testimony Bears the Burden of Proof

      The profferor of expert testimony has the burden of proving the admissibility of the testimony and the qualifications of the expert by a preponderance of proof.   See e.g., Meister v. Medical Engineering Corp., 267 F.3d 1123, 1127 n.9 (D.C. Cir. 2001) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 n.10 (1993)); Newton v. Roche Laboratories, Inc., 243 F.Supp.2d 672, 677 (W.D. Tex. 2002) (quoting Moore v. Ashland Chem., Inc., 151 F.3d 269, 276 (5th Cir. 1998, en banc), for the proposition: "The proponent need not prove that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable."); Saldo v.

Sandoz Pharmaceuticals, Inc., 244 F.Supp.2d 434, 526 (W.D.Pa. 2003) (stating: "Plaintiff bears the burden of demonstrating that each of her proffered experts is qualified to render an expert opinion, that the opinion is reliable, and that the opinion would assist the trier of fact in resolving a disputed issue of material fact—here, causation" and citing FedR.Evid. 702). In Caraker v. Sandoz Pharm. Corp., the court reviewed the plaintiff's burden:

> The plaintiffs had the burden of showing two things. First, they had the burden of showing that their experts' opinions were reliable. The hallmark of this reliability prong is the scientific method, i.e., the generation of testable hypotheses that are then subjected to the real world crucible of experimentation, falsification/validation, and replication. Second, they must show that their experts' opinions 'fit' (i.e., have a valid scientific connection to) the issues in this lawsuit so as to assist the fact-finder in understanding the evidence. This requirement is not satisfied when there is simply too great an analytical gap between the data and the opinion proffered.

188 F.Supp.2d 1026, 1030 (S.D.Ill. 2001) (internal quotations omitted). "In challenging plaintiff's proposed expert testimony, defendant is not required to come forward with 'scientific evidence' negating plaintiff's claims." Id. "Rather, defendant is entitled to point out deficiencies in plaintiff's proof." Id. citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

4. The Standard for Admissibility of Expert Testimony

When determining whether a proffer of expert testimony is sufficient to meet the burden of demonstrating evidentiary reliability, a trial court must review the testimony and the qualifications of the expert to determine whether the expert testimony is sufficiently reliable to be admissible. Dyas v. United States, 376 A.2d 827, 832 (D.C. 1977). In Dyas, the District of Columbia Court of Appeals announced a three part test

applied to determine the admissibility of expert testimony:  1) "The subject matter must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman; 2) "The witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth"; and 3) expert testimony is inadmissible if "the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert." Haidak v. Corso, 841 A.2d 316, 322 (D.C. 2004) (quoting Dyas, 376 A.2d at 832).  The Dyas test remains the standard in the District of Columbia.  Drevenak v. Abendschein, 773 A.2d 396, 418 n32 (D.C. 2001).  The third prong of the Dyas test has been linked to the test announced in Frye v. U.S., 54 App.D.C.46 (1923).  Id.

5.    Reliability Under *Frye v. United States* – General Acceptance

Frye is the standard test in the District of Columbia for determining admissibility of expert testimony as scientifically reliable.[4]  Drevenak, 773 A.2d at 418 n.32; Frye v. United States, *supra*; *see also* Bahura v. S.E.W. Investors, 754 A.2d 928, 943 n.15 (D.C. 2000) (rejecting plaintiffs' request to apply the Daubert standard in determining the admissibility of their expert testimony:  "The Frye test remains in effect in this jurisdiction, however…"); United States v. Porter, 618 A.2d 629, 633 (D.C. 1992) (Before applying the Frye test, the court states:  "Some jurisdictions have therefore abandoned Frye for a more liberal approach….This court, however, continues to adhere to the traditional standard."); Reed v. United States, 828 A.2d 159, 164 n.3 (D.C. 2003) (rejecting appellant's argument that the standard set forth in Kumho Tire Co. v.

---

[4] Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 593 (1993), has displaced Frye in many jurisdictions.  However, the more restrictive Frye test remains the standard in the District of Columbia.

Carmichael, 526 U.S. 137 (1999), was the appropriate standard and noting "Kumho is not the law in this jurisdiction, which uses the general acceptance standard set forth in Frye v. United States."). The Frye standard applicable in the District of Columbia is more rigorous than the Daubert standard that now applies in federal court. See Porter, supra, 618 A.2d at 633; Blum v. Merrell Dow Pharm., Inc., 564 Pa. 3, 5-6, 764 A.2d 1, 3 (Pa. 2000) ("Daubert [is] a standard somewhat less exacting than that of Frye"; "Daubert relaxes, to some extent, the impediments to admission of novel scientific evidence.")

Under the Frye test, a court must determine that the scientific method used by the expert is "sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye, 293 F. at 1024. As the District of Columbia Court of Appeals has noted:

> [G]eneral acceptance is general acceptance. If scientists significant in either number or expertise publicly oppose a new technique as unreliable then that technique does not pass muster under Frye.

United States v. Porter, 618 A.2d 629, 634 (D.C. 1992) (internal citations omitted). "Frye requires the profferor of the expert on a new scientific theory to show that the evidence is not still in the experimental stage but has gained a scientific acceptance substantial enough to warrant the exercise of judicial discretion in favor of admissibility." Ibn-Tamas v. United States, 407 A.2d at 895 (Gallagher, J., concurring). Therefore, it is vital to the admissibility of expert testimony that the methodology used by the expert to reach his conclusion(s) is generally accepted in the scientific community as producing scientifically reliable results.

The language of some cases refers primarily to methodology. Courts have recognized that in evaluating the methodology used, a determination of admissibility

requires determining whether the expert properly applied an accepted methodology to reach his results.  "[C]onclusions and methodology are not entirely distinct from one another."  Joiner, 522 U.S. at 146.  The distinction between methodology and its application is simply not viable.  In re Paoli RR Yard PCB Litigation, 35 F.3d 717, 745 (3rd Cir. 1994) ("[I]t is extremely elusive to attempt to ascertain which of an expert's steps constitute parts of a 'basic' methodology and which constitute changes from that methodology.").

The importance of looking not only at the methodology purportedly used, but the quality of the application of that methodology is particularly important where testimony is not based on independent research.  In re Phenylpropanolamine (PPA) Products Liability Litigation, 289 F.Supp.2d 1230, 1238 (W.D.Wash. Jun. 18, 2003).  "In the absence of independent research or peer review, experts must explain the process by which they reached their conclusions and identify some type of objective source demonstrating their adherence to the scientific method."  Id. at 1238 (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., ("Daubert II"), 43 F.3d 1311, 1318-19 (9th Cir. 1995) and Domingo v. T.K., 289 F.3d 600, 605-06 (9th Cir. 2002)).  "When a scientist claims to rely on a method practiced by most scientists, yet presents conclusions that are shared by no other scientist, the...court should be wary that the method has not been faithfully applied."  Lust v. Merrell Dow Pharmaceuticals, Inc., 89 F.3d 594, 598 (9th Cir. 1996) (concluding that to enforce the burden placed on the proponent to prove admissibility, the court can exclude the opinion "if the expert fails to identify and defend the reasons that his conclusions are anomalous").

Moreover, a court need not rely on the expert's averment that "the data

underlying his or her opinion are the type of data on which experts reasonably rely." Merrell Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706, 713 (Tex. 1997).  If the underlying data are so lacking in probative force and reliability that no expert could base an opinion on them, an opinion which rests entirely on them must be excluded.  Id. (citing In re Paoli, 35 F.3d 717, 747-48 (3rd Cir. 1994)); see also Nelson v. American Home Products Corp., 92 F.Supp.2d 954, 968-969, 972-73 (W.D.Mo. 2000) (rejecting experts' opinions that amiodarone causes optic neuropathy where opinions were based on unreliable data).

6.  Opinions Generated in the Context of Litigation Are Unreliable

Before covering the specific types of evidence to which courts turn to determine the scientific validity of a proffered opinion, it is important to note that federal courts have routinely held that whether the proffered expert developed his opinions in the context of litigation is significant.  See Reynard v. NEC Corp., 887 F.Supp. 1500, 1507 (N.D.Fla. 1995); Washington v. Vogel, 880 F.Supp. 1545, 1548 (M.D. Fla. 1995); In re Diet Drugs, No. MDL 1203, 2001 WL 454586, *14 (E.D.Pa. 2001).  As stated in Lust, "[i]t is not unreasonable to presume that [an expert]'s opinion...was influenced by litigation-driven financial incentive" when the expert is a professional plaintiff's witness. 89 F.3d at 597 (rejecting argument that expert developed his opinions outside the litigation context despite expert's publishing an article prior to the Lust litigation).

7.    Types of Scientific Evidence that May Support a Reliable Opinion

Courts have routinely looked to several types of evidence to determine the reliability of expert testimony regarding causation, particularly in cases involving allegations that a drug caused a disease or injury.  Before examining the proffered testimony in this case, a review of the types of evidence generally relied upon by

experts is appropriate.

a.      Epidemiological studies are the "gold standard"

"Epidemiological studies examine existing populations to attempt to determine if there is an association between a disease or condition and a factor suspected of causing that disease or condition."  Merrell Dow v. Havner, 953 S.W.2d 706, 715 (Tex. 1997).   Epidemiological studies are the "gold standard" for determining a causal relationship between a drug and an illness or injury.  In re Breast Implant Litigation, 11 F.Supp.2d 1217, 1224-25 (D.Colo. 1998) ("Epidemiology is the best evidence of causation in the mass torts context."); see also Richardson v. Richardson-Merrell, Inc., 857 F.2d 823, 831 n.59 & 832 (D.C.Cir. 1988) ("epidemiological studies are of critical significance"); Meister, 267 F.3d at 1127 ("testing the case reports through epidemiological studies – the methodology that calls for checking controlled population studies to see if they confirm the hypotheses suggested in individual case reports – is 'an important scientific approach."); Miller v. Pfizer, Inc., 196 F.Supp.2d 1062, 1081 (D.Kan. 2002) ("the role of RCT's and large-scale epidemiological studies as 'very pertinent' in evaluating the relative risks of potential associations between sertraline and suicide."); Soldo v. Sandoz Pharm. Corp., 244 F.Supp.2d 434, 532 (W.D. Pa. 2003) ("Epidemiology is the primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or a disease."). In Allen v. Pennsylvania Eng'g Corp., 102 F.3d 194, 197 (5th Cir. 1996), the Court held that where no epidemiologic study has found a statistically-significant link between the product and the alleged injury, expert testimony of an association does not meet the required standard of reliability.  See also Brock v. Merrell Dow Pharmaceuticals, Inc.,

874 F.2d 307, 311-15 (5th Cir. 1989) (holding that a lack of epidemiological proof is fatal, especially where the only other evidence is animal studies); Lynch v. Merrell-Nat'l Labs., 830 F.2d 1190, 1195-97 (1st Cir. 1987) (holding that epidemiological evidence is required even where expert has submitted an analysis of chemical structure and of the effect on animals).  The absence of reliable epidemiological evidence can be fatal to the proffer of expert testimony.   Without such evidence, the profferor faces a difficult challenge in meeting her burden of proving reliability.

b.     *Case reports are generally unreliable*

Case reports are anecdotal reports of adverse events.  Such reports evince "[a] mere temporal association between exposure and an adverse occurrence [which] can be due to chance or numerous other factors. . .[therefore,] anecdotal reports of adverse events [are] unreliable evidence for analyzing general causation issues."  Soldo, 244 F.Supp.2d at 540; Meister, 267 F.3d at 1127; see also Glastetter v. Novartis Pharm. Corp., 252 F.3d 986, 990-91 (8th Cir. 2001) ("causal attribution based on case studies must be regarded with caution.").   Because of their unreliability, case reports are generally not an accepted methodology for determining general causation.  See Miller v. Pfizer, Inc., 196 F.Supp.2d 1062, 1085 (D.Kan. 2001) (noting that "heavy reliance on case reports is not an accepted methodology for determining the strength of association between [a drug] and [an injury or disease]"); Nelson v. American Home Products Corp., 92 F.Supp.2d 954 (W.D.Mo. 2000) (holding, despite fact that the case reports relied upon were all published and therefore subject to peer review, "such reports evade review because they do not advance testable scientific analysis").

c.     *Differential diagnosis is used for determining specific causation and requires the use of scientifically valid techniques to have*

12

*evidentiary reliability*

An expert can rely on differential diagnoses analysis to bolster the scientific validity of his opinion regarding causation.   See e.g., Paoli, 35 F.3d at 758-59. Differential diagnosis involves assessing causation with respect to a particular individual.  Id. at 758.   The opinion of a doctor who has engaged in few standard diagnostic techniques in conducting a differential diagnosis should be excluded unless the doctor offers a good justification for his or her conclusion.  Id. at 761.  For instance, "[w]ithout sufficient reliable evidence of general causation,…experts c[an] not reliably apply a differential diagnosis that comports with the scientific method, notwithstanding the fact that physicians in clinical practice may be required to proceed with a differential diagnosis on the basis of guesses or hypotheses due to the exigency of the need to treat their patients." Soldo, supra, 244 F.Supp.2d at 528-29.  Differential diagnosis is a technique for determining specific causation.  It is inapplicable to the question of general causation.

In conducting differential diagnosis, an expert is first required to "rule in" the alleged cause by showing that the drug is capable of causing the condition.  Glastetter v. Novartis Pharmaceuticals Corp., 252 F.3d 986, 989 (8th Cir. 2001) ("a physician begins by 'ruling in' all scientifically plausible causes"); see also Hollander v. Sandoz Pharmaceuticals Corp., 289 F.3d 1193, 1211 (10th Cir. 2002) ("the expert must 'rule in' the other suspected cause as well as 'rule out' other possible causes").  If the expert is able to rule in the drug, then the expert must systematically "rule out" other potential causes of the condition.  Glastetter, 252 F.3d at 989 ("the physician then 'rules out' the least plausible causes of injury until the most likely cause remains"); Hollander, 289

F.2d 1211.  In ruling out plausible alternatives, the differential diagnosis is invalid if the expert "offers no explanation for why he or she has concluded that was not the sole cause, the [expert]'s methodology is unreliable."  Soldo, 244 F.Supp.2d at 551.  In fact, the "plaintiff's experts must show that [plausible alternative hypotheses] have been reliably ruled out."  Id.

In summary, differential diagnosis does not obviate the need for scientifically valid evidence that proves general causation.  Rather differential diagnosis can only validly proceed after general causation has been demonstrated, i.e. it has been shown that the drug is capable of causing the injury.  Glastetter, 252 F.3d at 989 (upholding trial court's exclusion of differential diagnosis where the "data [did] not demonstrate to an acceptable degree of medical certainty that [the drug] can cause [the alleged injury]"); Hollander, 289 F.2d 1211 ("experts would need to present reliable evidence that the drug can cause strokes").

8.    *Daubert v. Merrell Dow Pharmaceuticals, Inc.*

While Frye is the standard in District of Columbia courts, an examination of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and the factors adduced thereunder is enlightening.  This is so both because so many decisions have been rendered in federal courts applying the Daubert test in trying to determine reliability and because the Daubert test does include a consideration of whether there is general acceptance of a scientific methodology.  Therefore, Daubert cases provide examples of the outer limits of evidentiary reliability and of the application of the general acceptance test.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993), the

Supreme Court listed four specific factors that a trial court should consider when determining the admissibility of expert testimony.  The factors are:  (1) Whether a theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate or error and whether there are standards controlling the technique's operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.  <u>See Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 149-50 (1999) (listing factors and quoting <u>Daubert</u>, 509 U.S. at 592-94).  Under <u>Daubert</u>, the factors are not exclusive.  A trial court could properly rely upon another set of reasonable reliability criteria that was appropriate to the particular facts of the case.  <u>See Kumho</u>, 526 U.S. at 158.  Of course, the expert testimony at issue in <u>Daubert</u> involved whether a drug caused a particular injury to those taking it.  <u>Daubert</u>, 509 U.S. at 579.  The issue in the case at hand is, likewise, whether there is a causal relationship between ingesting a therapeutic drug and a temporally related illness or injury.  Therefore, the original <u>Daubert</u> framework is well-suited to an analysis of the case at hand.

III.    **ARGUMENT**

With regard to the first prong of the <u>Dyas</u> test, Defendant acknowledges that the issue of causation in this complex medical malpractice case is "beyond the ken of the average layman," and therefore, expert testimony is necessary.  Regarding the second prong, Defendant does not, at this time, challenge the skill, knowledge, and experience of Plaintiff's experts or treating physicians, but reserves the right to do so at a later date.  Thus, this Motion is directed at the sufficiency of Plaintiff's proffer with respect to the

third prong of the <u>Dyas</u> test, which involves a reliability determination as guided by <u>Frye</u>.

Plaintiff has alleged that Seroquel, prescribed to her by Defendant, caused her to suffer tardive dyskinesia.  This claim is scientifically unfounded.  Nevertheless, Plaintiff intends to rely on expert and treating physician testimony in an attempt to support her claim that Seroquel can cause tardive dyskinesia.  Pursuant to the relevant (above-cited) case law, in order to do so, Plaintiff has the burden of establishing that the current state of scientific knowledge related to Seroquel permits a reasonable opinion to be asserted by an expert; in other words, that there is an accepted, scientifically supported basis for such an opinion.  To accomplish this, Plaintiff must demonstrate for the Court that Seroquel has been causally linked by some form of accepted scientific methodology to tardive dyskinesia.  However, Plaintiff's experts' opinions to this point are not well recognized scientific principles and are not supported by any methodology accepted by the scientific community, notably due to the fact that no such methodology exists.  As such, none of Plaintiff's witnesses, expert or otherwise, can render a reasonable opinion as to this point.  Because the proffered expert testimony lacks a sufficient scientific basis to meet the standard of reliability required by <u>Frye</u> and <u>Dyas</u>, Plaintiff should be precluded from offering testimony on the causation issue of Seroquel causing tardive dyskinesia.

A review of the deposition testimony of five witnesses (four of whom testified on behalf of Plaintiff and one of whom testified on behalf of prior Co-Defendant AstraZeneca)[5] elucidates the lack of scientific support for Plaintiff's allegation that Seroquel caused Plaintiff to suffer tardive dyskinesia.  Below are excerpts from those

---

[5] AstraZeneca is no longer a party to this case, summary judgment having been granted in their favor on July 9, 2012.

depositions which highlight the lack of scientific methodology or data necessary to permit Plaintiff's experts the ability to offer a reasonable opinion in support of Plaintiffs allegation that Seroquel caused Plaintiff to suffer tardive dyskinesia.

### A. There is no evidence based on the clinical trials conducted on Seroqeul that Seroquel causes tardive dyskinesia.

AstraZeneca, the pharmaceutical manufacturer of Seroquel, has conducted extensive clinical research on Seroquel.  Specifically, 26,000 patients were involved in clinical trials over the course of a 15 year period (from approximately 1994 – 2009). Exh. 2 at 108.  Thor Rak, M.D., AstraZeneca's Vice President of the Global Clinical Neuroscience Therapy Division, who testified on behalf of AstraZeneca, was hired by AstraZeneca in 1996 and began working with Seroquel as a researcher that same year. Id. at 81:22 – 82:5.  As a result of his position with AstraZeneca and his involvement in the Seroquel clinical trials, Dr. Rak possesses an intimate familiarity with the Seroquel clinical trial results, i.e., its effectiveness in treating various conditions and, pertinent to this case, the possibility of it causing tardive dyskinesia.

Dr. Rak's deposition was noted by Plaintiff's counsel.  During his deposition, Dr. Rak was specifically asked about the connection between Seroquel and tardive dyskinesia. As set forth below, a review of the data gleaned from the Seroquel clinical trials, which was explained by Dr. Rak during his deposition, reveals that Seroquel is not a recognized cause of tardive dyskinesia.  To this end, consider the following:

> Q: Doctor, can Seroquel cause tardive dyskinesia?
> A: Based on everything we know about the medicine, I would say no.

Id. at 8:9-12.

> Q: Then just so I'm clear.  I'm getting ready to move on.  So based on the Seroquel studies you're aware of these 26,000 people, .2 percent of those

> developed tardive dyskinesia while taking Seroquel, **but there's no evidence that the Seroquel was the cause of the tardive in those patients; is that correct?**
> **A: That's correct.**

Id. at 41:9-16[6] [emphasis added].

> **Q**: Now, those 53 reports, did they have similar sorts of confounders of other drugs, other conditions as the three that you had seen back in 1997 with schizophrenia?
> **A**: That certainly was the pattern we were seeing.  So because the patients had so many other risk factors for tardive dyskinesia, we could not conclude, nor did the FDA conclude that Seroquel causes tardive dyskinesia.
> **Q**: So even as of 2009 when you're now seeing 26,000 patients, was there evidence that would allow you to conclude that Seroquel causes tardive dyskinesia?
> **A**: No, there was no evidence that would support that conclusion, no.

Id. at 123:23 – 124:15.[7]

Dr. Rak's deposition testimony clearly established that the clinical trials provided no evidence establishing a causal link between Seroquel and tardive dyskinesia.  Moreover, none of Plaitniff's expert witnesses (or treating fact witnesses) contradicted, or even attempted to contradict, Dr. Rak's explanation of the fact that the Seroquel clinical trials resulted in the conclusion that Seroquel **is not** a recognized cause of tardive dyskinesia.  Similarly, Plaintiff's experts did not (nor could they) point to any other clinical studies or epidemiological studies – which are the "primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or a disease" (Soldo, 244 F.Supp.2d at 532) – that

---

[6] The .2% figure represents 52 – 53 reports of tardive dyskinesia in 26,000 clincial database patients over the course of approximately 15 years of clinical research with Seroquel.  See Rak Deposition, 108.

[7] In other words, Dr. Rak testified that all 53 patients who report tardive dyskinesia during the clinical trials exhibited risk factors known to cause tardive dyskinesia.  Therefore, because other causes of tardive dyskinesia were present, it was not possible to establish a causal link between Seroquel and tardive dyskinesia.  On the other hand, none of the patients who took Seroquel absent other risk factors reported developing tardive dyskinesia.  Thus, it is important to recognize this distinction when reviewing the clinical trial results and evaluating Plaintiff's causation allegation.

resulted in data contrary to the Seroquel clinical trials.  Clearly then, based on Dr. Rak's uncontroverted testimony, no scientific data exists upon which Plaintiff's experts (or treating fact witnesses) can rely to support their opinions that Seroquel can cause tardive dyskinesia.

> **B. With the exception of this Plaintiff, none of Plaintiff's expert or other witnesses have ever diagnosed a patient with Seroquel-induced tardive dyskinesia.**

Three of Plaintiff's experts and one treating physician testified that they have never diagnosed a patient (other than Plaintiff, conincidently) with Seroquel-induced tardive dyskinesia.  This testimony is consistent with the above-addressed clinical trial conclusion that Seroquel is not a cause of tardive dyskinesia.  Below are excerpts reflective of that testimony.

**1.    Basil Jackson, M.D.**

Dr. Jackson, a liability and standard of care expert designated by Plaintiff, has practiced psychiatry for 53 years and even today, continues to prescribe medication and perform medication reviews.  However, in spite of all of his experience, Dr. Jackson has "never seen tardive dyskinesia as the result of Seroquel."  Jackson Deposition, attached hereto as Exhibit 3, at 15:19-20.  Later in his deposition, Dr. Jackson reiterated this fact, stating: "I believe my earlier testimony was that I have never seen a patient develop – conclusively develop tardive dyskinesia as the result of Seroquel."  Id. at 52:21-23.

**2.    Steven Lo, M.D.**

Dr. Lo, who completed a four-year residency in neurology and a two-year fellowship in movement disorders, is currently an assistant professor of neurology at the Georgetown University School of Medicine and a member of the movement disorder

division where his primary responsibility is to evaluate and manage patients with movement disorders. Plaintiff designated Dr. Lo, one of Plaintiff's treating neurologists, as an expert. In his capacity as Plaintiff's treating neurologist, Dr. Lo diagnosed Plaintiff with Seroquel-induced tardive dyskinesia. However, that diagnosis was made absent any accepted scientific basis and Dr. Lo testified that Plaintiff's Seroquel-induced tardive dyskinesia diagnosis was made despite the fact that he had never seen or heard of any other case where such a diagnosis had been made. Lo Deposition, attached hereto as Exhibit 4, at 133:13 – 134:2,. Specifically, Dr. Lo testified that Plaintiff was, and remains, the only person he has ever seen with a diagnosis of Seroquel-induced tardive dyskinesia.

> **Q**: At the time you started seeing Ms. Patteson you had never seen a presentation like hers due to Seroquel alone; correct?
> **A**: Correct

Id. at 115:5-8

> **Q**: Since you first saw Kay Patteson in your personal experience have you ever had another patient have a presentation similar to Kay Patteson where Seroquel was the only neuroleptic involved?
> **A**: No.

Id. at 116:11-15. Seemingly aware that the causal link between Seroquel and tardive dyskinesia upon which his diagnosis was founded is not accepted by the medical field, Dr. Lo essentially testified that his diagnosis was not conclusive, stating that he was unable to exclude other possible causes of Plaintiff's alleged tardive dyskinesia (see id. at 124 – 125) and that he identified Seroquel as a potential cause of Plaintiff's tardive dyskinesia because he was unable to identify another cause. Id. at 133:13 – 134:2. Dr. Lo provided no scientific methodology or evidence in support of his opinion. His testimony is wholly consistent with Dr. Rak's testimony regarding the clinical findings

addressed above.

3.      **Sudeshna Bose, M.D.**

Dr. Bose, designated as an expert by Plaintiff, completed a residency in neurology and a fellowship in movement disorders. She has been practicing as a movement disorder specialist since approximately 2002. Consistent with the above opinions, though elusive in her answers, Dr. Bose was unable to provide an instance where she diagnosed a second-generation antipsychotic-induced tardive dyskinesia.

> **Q**: Okay. Have you ever been the initial physician making a diagnosis of a second-generation neuroleptic-induced tardive dyskinesia where the patient had not previously been on a first-generation neuroleptic?
> **A**: I can't tell you off the top of my head.
> **Q**: Fair statement to say that you do not recall making the diagnosis yourself of a second-generation neuroleptic tardive dyskinesia where a first generation has not also been in play?
> **A**: Again, I – you know, I just don't remember.

Bose Deposition, attached hereto as Exhibit 5, at 15:17 – 16:2.[8] In fact, Dr. Bose essentially testified that she had no basis whatsoever for her conclusion that Plaintiff suffered from Seroquel-induced tardive dyskinesia.

> **Q**: Doctor, we can agree, I think, you testified earlier that you did not do any specific workup of Kay Patteson to ascertain whether she in fact had a Seroquel-induced tardive dyskinesia, correct?
> **A**: That's correct.
> **Q**: In addition to that you did no independent investigation to ascertain whether Kay Patteson had a Seroquel-induced tardive dyskinesia, correct?
> **A**: That's correct.
> **Q**: And as we went through you could not indentify what, if any records that you had that led you to believe that Kay Patteson has a Seroquel-induced tardive dyskinesia, correct?
> **A**: That's correct.
> **Q**: And as you sit here today the only basis that you have that Kay Patteson herself had a Seroquel-induced tardive dyskinesia is from the history that you elicited from the patient?
> **A**: Yeah, yes.

---

[8] The terms antipsychotic and neuroleptic may be used interchangeably.

Id. at 68:12 – 69:9.  This exchange serves as a further discredit to Dr. Bose's diagnosis of Seroquel-induced tardive dyskinesia.  Aside from the fact that there is no scientific support for her diagnosis (if that glaring reality can be set aside), Dr. Bose's testimony clearly demonstrates that she does not possess the requisite personal knowledge of Plaintiff's circumstances or the underlying facts of this case to render helpful opinions related to Plaintiff's health conditions.  As such, her testimony should be excluded.

**4.     Peter Bernad, M.D.**

Dr. Bernad, one of Plaintiff's treating neurologists, is a board-certified neurologist with 28 years of experience.  Dr. Bernad echoed the above testimony, stating that he could not attribute Seroquel to tardive dyskinesia.  Specifically, Dr. Bernad testified with regard to this point:

> **Q**: Okay.  On that second subset of patients who had never been on a previous first-generation antipsychotic, have you ever seen neurologic problems similar to Kay Patteson's just taking Seroquel up – as of May of 2007?
> **A**: I would [say] no.[9]

Bernad Deposition, attached hereto as Exhibit 6, at 14:9-14

> **Q**: Up until [May of 2007] had you ever seen a patient who had only been on Seroquel suffer those types of neurologic complaints?
> **A**: No.

Id. at 16:20 – 17:17.

The personal experiences of the above experts and treating physicians – all of whom testified that Plaintiff is the only person they have ever seen who has been diagnosed with Seroquel-induced tardive dyskinesia – is consistent with the Seroquel clinical trials that resulted in the conclusion that Seroquel is not a cause of tardive

---

[9] The word "say" has been included as a contextual review of the entirety of this portion of the transcript leads to the conclusion that the word "say" was inadvertently omitted.

dyskinesia.  The consistency in testimony among Plaintiff's experts further supports the fact that the current state of scientific knowledge does not permit those experts to assert a reasonable opinion that Seroquel causes tardive dyskinesia.  Thus, Plaintiff's experts and treating physicians should be precluded from testifying that Seroquel can cause tardive dyskinesia or that Plaintiff suffered from Seroquel-induced tardive dyskinesia.

### C. No medical literature or study that links Seroquel to tardive dyskinesia.

There exists no medical literature that attributes Seroquel to causing tardive dyskinesia, a fact which was corroborated by Plaintiffs experts and relevant treating physicians.  Plaintiff's witnesses who testified regarding her claim of a causal link between Seroquel and tardive dyskinesia uniformly agree that no medical literature or study exists that establishes a causal link between Seroquel and tardive dyskinesia. The clarity of the deposition testimony, outlined below, obviates the need for additional commentary.

**1.    Basil Jackson, M.D.**

The following exchange occurred during Dr. Jackson's testimony:

**Q**: Okay.  You yourself have never seen a case nor read about a case, aside from Kay Patteson, of tardive dyskinesia where only a second generation neuroleptic was used, such as Seroquel, correct?
**A**: Correct.

Exh. 3 at 65:13-17.

**2.    Steven Lo, M.D.**

From the deposition of Dr. Lo:

**Q**: And you hadn't seen any case like this in the literature before; right?
**A**: That's true.

Exh. 4 at 36:11-13.

**Q**: And you hadn't heard of any case reports of Seroquel being associated with any tardive dyskinesia?
**A**: No specific case reports, no.

Id. at 84:4-7.

**Q**: During all the literature that you reviewed either to prepare for the presentation in Paris or at any other time during the course of your professional career have you ever seen a presentation similar to Kay Patteson where Seroquel was the only medication involved?
**A**: No.

Id. at 117:6-12.  Closing the loop on Dr. Lo's knowledge of any scientific methodology

that could support this diagnosis, the following exchange occurred:

**Q**: Have you seen from any source beyond literature, your own personal experience or any CME conference or other conferences where there has been a patient that's presented similar to Kay Patteson where Seroquel was the only neuroleptic used?
**A**: No.

Id. at 119:9-14.

3.      **Sudeshna Bose, M.D.**

Continuing to provide elusive responses, Dr. Bose testified:

**Q**: Are you able to point me to any medical literature which shows that a second-generation neuroleptic has caused a case of tardive dyskinesia?
**A**: Not offhand.

Exh. 5 at 15:5-8.

4.      **Peter Bernad, M.D.**

From the deposition of Dr. Bernad:

**Q**: Okay.  Have you ever read about it in the medical literature that you can recall a patient suffering the types of neurologic complaints that Kay Patteson was complaining to you of on May 5, '07, that was only on Seroquel?
**A**: No.

Exh. 6 at 17:2-7.

The absence of any medical literature linking Seroquel to tardive dyskinesia is further support for the fact that there is no scientific methodology in support of Plaintiff's experts' opinions that Seroquel causes tardive dyskinesia.  This reality is all the more glaring when considered in light of the fact that Plaintiff's experts agree that no such methodology exists.  As the current state of scientific knowledge does not permit a reasonable opinion (that Seroquel causes tardive dyskinesia) to be asserted, Plaintiff's experts and treating physicians should be precluded from testifying that Seroquel can cause tardive dyskinesia or that Plaintiff suffered from Seroquel-induced tardive dyskinesia.

### D. The Seroquel package insert/Physicians' Desk Reference ("PDR") does not provide any support for Plaintiff's allegation that that Seroquel causes tardive dyskinesia.

In what appears to be an attempt to validate Plaintiff's claim that Seroquel can cause tardive dyskinesia, Plaintiff's counsel focused a great deal of attention during Dr. Rak's deposition on the fact that the Seroquel package insert (which insert is reflected in the PDR) warns of the potential side effect of tardive dyskinesia.  However, as explained by Dr. Rak, the warning does not indicate anywhere that Seroquel can cause tardive dyskinesia.  Rather, the package insert contains a general tardive dyskinesia warning applicable to **all** similar medications.  Known as a class label or warning, that is included with every atypical antipsychotic medication.  To that point, Dr. Rak testified that "the package insert that we're referring to is the US label.  So that is what the FDA wants to be stated in the label for all antipsychotic medications.  And the FDA would not differentiate Seroquel compared to other medications in this class."  Exh. 2 at 12:6-11.

Reiterating this point, Dr. Rak stated that "the health authorities would not want to give one medication a competitive advantage.  So they imposed a class label on all of the medicines in the new class."  Id. at 133:8-11.  Dr. Rak further explained that "the language that the FDA insists that we have in our package insert is different from the language we would have stating our company position about Seroquel."[10] Id. at 13:12-15.

The concept that a warning of a side effect does not necessarily indicate that a particular medication can actually cause the warned-of side effect was explored in an unreported Federal Claims decision.[11] Stapleford v. Secretary of Health and Human Services, No. 03-234V, 2009 WL 1456441, at *11 (Fed.Cl. May 01, 2009) (aff'd Stapleford ex rel. Stapleford v. Secretary of Dept. of Health and Human Services, 89 Fed.Cl. 456 (2009)).  In Stapleford, petitioner alleged that a vaccine caused her child's seizure disorder and developmental problems.  At issue in that case, among other things, was the question of whether a warning in the PDR was sufficient to establish causation.  The Court held that the PDR warning did not provide significant or sufficient evidence of causation, stating in pertinent part:

> [T]he important general lesson from those opinions is that the mere listing of a potential adverse event in the PDR section applicable to a particular vaccination should *not* automatically be viewed as evidence that the vaccination can *cause* that adverse event.  As the evidence in this case demonstrates, adverse events may be listed in the PDR merely because they have been reported to occur after vaccination, without any determination by anyone as to whether it is plausible that the vaccination can actually *cause* such events.  Rather, in any case in which a PDR excerpt is offered as evidence of causation, one must study the *particular* entry in the PDR.  In some instances, the PDR may describe actual studies that *do* provide significant evidence pointing to a causal

---

[10] AstraZeneca's company position, based on clinical research, is that Seroqeul has not been demonstrated to cause tardive dyskinesia.  See Rak Deposition, 9:17-21.
[11] Rendered by a special master.

relationship. But in other instances, the PDR may merely list an adverse event as having occurred, without providing any significant evidence as to causality.  In this particular case, I find that the particular PDR excerpt does *not* provide significant evidence concerning causation. . .”

Id. at *11-12 [emphasis in original].   Here, like in Stapleford, the warning does not “describe actual studies that *do* provide significant evidence pointing to a causal relationship” between the medication and the complained of injury. Id. at 11.   Thus, the package insert/PDR is insufficient support for Plaintiff's allegation of a causal link between the medication (Seroquel) and the complained of injury (tardive dyskinesia). As the package insert in the instant case does not reflect scientific methodology or accepted knowledge regarding a causal link between Seroquel and tardive dyskinesia, and because the warning is present as a non-Seroquel specific class warning at the insistence of the FDA rather than as a result of evidence derived from scientific studies, the inclusion of such a warning in the package insert does nothing to bolster or validate Plaintiff's scientifically unfounded allegation that Seroquel caused her to suffer tardive dyskinesia.

### IV.    CONCLUSION

Plaintiff's allegation that Seroquel caused her to suffer tardive dyskinesia is clearly unfounded in scientific methodology and is unsupported by any evidence.  The testimony addressed herein establishes that there is no accepted scientific methodology upon which anyone in the medical profession could rely in establishing a causal link between Seroquel and tardive dyskinesia.  That unmistakable conclusion does not lend itself to a reasonable opinion as required by Frye and Dyas and therefore, Plaintiff cannot meet her burden of establishing the admissibility of her experts' and treating physicians' testimony.

Plaintiff's experts and treating physicians could have relied on several different methodologies (see supra Section II.6) in support of their conclusion that Seroquel can cause tardive dyskinesia, including, notably, epidemiological studies which are the "primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or a disease." Soldo, 244 F.Supp.2d at 532. However, they did not rely on any such methodologies because no such methodologies exist with regard to Seroquel.  Because none of Plaintiff's witnesses have a scientific basis for their opinions that Plaintiff suffered from Seroquel-induced tardive dyskinesia, and because the state of scientific knowledge does not permit such an opinion (or, in the parlance of Frye, lacks sufficient establishment to have gained general acceptance) Defendant respectfully requests that all of Plaintiff's experts be precluded from offering testimony on the unfounded causation issue of Seroquel-induced tardive dyskinesia.

WHEREFORE, for the foregoing reasons, Defendant John R. Maloney, M.D. respectfully requests this Honorable Court preclude the testimony of Plaintiff's experts and treating physicians on the issue of Seroquel-induced tardive dyskinesia.

Respectfully submitted,


_____/s/ Gregory S. McKee_____
Gregory S. McKee, Esquire (Bar #470474)
Wharton, Levin, Ehrmantraut, & Klein, P.A.
104 West Street, P.O. Box 551
Annapolis, MD 21404-0551
Tel. (410) 263-5900
Fax (410) 263-6583
Counsel for Defendant John R. Maloney, M.D.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15 day of July, 2013, a copy of Defendant John R. Maloney, M.D.'s Memorandum of Points and Authorities was sent via e-mail and mailed, postage prepaid, to:

Kenneth M. Trombly, Esquire
Daniel Singer, Esquire
Schultz & Trombly, PLLC
1050 17th Street, N.W., Suite 1250
Washington, D.C.  20036
*Counsel for Plaintiffs*

John P. Leader, Esquire
The Leader Law Firm
3567 East Sunrise Drive
Suite 133
Tucson, AZ  85718
*Counsel for Plaintiffs*

Timothy J. Aiken, Esq.
Aiken & Scoptur, SC
2600 North Mayfair Road
Suite 1030
Milwaukee, WI  53226-1308
*Counsel for Plaintiffs*

*/s/ Gregory S. McKee*
Gregory S. McKee, Esquire

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

KAY PATTESON
and GARY PATTESON

   Plaintiffs,

    v.

JOHN R. MALONEY, M.D.,

   Defendant.

Case:  1:10-CV-01760
Judge James E. Boasberg

## ORDER

Upon consideration of Defendant John R. Maloney, M.D.'s Motion for <u>Frye</u> Hearing regarding the proposed trial testimony of Plaintiff's experts and non-expert treating physicians as to the issue of Seroquel-induced tardive dyskinesia, and any opposition thereto, if is this _____ day of _____, 2013, in the United States District Court for the District of Columbia, hereby

**ORDERED**, that the aforementioned Motion is **GRANTED.**

_____
James E. Boasberg, Judge
United States District Court for the
District of Columbia

Copies to:

**See Attachment A**

**Attachment A**

Gregory S. McKee, Esquire
Wharton, Levin, Ehrmantraut, & Klein, P.A.
104 West Street, P.O. Box 551
Annapolis, MD 21404-0551
*Counsel for Defendant John R. Maloney, M.D.*

Kenneth M. Trombly, Esquire
Daniel Singer, Esquire
Schultz & Trombly, PLLC
1050 17th Street, N.W., Suite 1250
Washington, D.C.  20036
*Counsel for Plaintiffs*

John P. Leader, Esquire
The Leader Law Firm
3567 East Sunrise Drive
Suite 133
Tucson, AZ  85718
*Counsel for Plaintiffs*

Timothy J. Aiken, Esq.
Aiken & Scoptur, SC
2600 North Mayfair Road
Suite 1030
Milwaukee, WI   53226-1308
*Counsel for Plaintiffs*