UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KAY PATTESON, ) | |
| ) | Case No. 10-CV-01760-JEB |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| JOHN MALONEY, M.D., ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT MALONEY'S
MOTION FOR *FRYE* HEARING TO PRECLUDE PLAINTIFF'S EXPERTS
TESTIMONY THAT SEROQUEL CAN CAUSE TARDIVE DYSKINESIA**

Plaintiff, by and through undersigned counsel, hereby opposes Defendant's motion to preclude her expert witnesses from testifying that Seroquel can cause tardive dyskinesia, and states as follows:

**I.     INTRODUCTION**

This case arises from the medical treatment that the Plaintiff, Ms. Kay Patteson, received from her psychiatrist, Defendant John Maloney, M.D., from May of 2006 through February of 2008. Plaintiff alleges that Dr. Maloney breached the duty of care owed to her in prescribing Seroquel, an antipsychotic drug with potentially potent side effects, to treat her insomnia despite the availability of other less dangerous treatment alternatives. Plaintiff has further alleged that, as a result of Dr. Maloney's inappropriate care in prescribing Seroquel,[1] she developed a debilitating and irreversible neuromuscular condition, known as tardive dyskinesia ["TD"], which causes her to suffer uncontrollable muscular tics throughout her body.

---

[1] The active ingredient in Seroquel is known in the medical community as "quetiapine." Therefore, references through the memorandum to either quetiapine or Seroquel should be understood as interchangeable.

1

On July 15, 2013, Defendant Maloney filed his "Motion For *Frye* Hearing to Preclude Plaintiff's Experts Testimony That Seroquel Can Cause Tardive Dyskinesia." Thereafter, the undersigned contacted Dr. Maloney's counsel, suggesting that admission of expert testimony in this Court is governed not by the *Frye* standard, but by Fed. R. Evid. 702 and the case law interpreting that rule, including *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, (1993), which specifically held that, "The Federal Rules of Evidence, not *Frye*, provide the standard for admitting expert scientific testimony in a federal trial." *Id.* at 579, 585-97. On August 1, 2013, in response to the undersigned's communications, the Defendant filed a short supplemental pleading, arguing that the challenged testimony does not comply with Fed. R. Evid. 702 and/or *Daubert*.

Defendant contends that there is no reliable basis for Plaintiff's experts to assert that Seroquel can cause TD.[2] In support of his argument, the Defendant boldly alleges that – despite the existence of an FDA-required label on Seroquel packaging that warns consumers of the risk of TD – no medical studies or literature support the Plaintiff's assertion that Seroquel can cause TD. Def. Supp. Mot., at 8-17. Secondly, Defendant seemingly disputes the sufficiency of the differential diagnosis performed by Plaintiff's treating physicians – and whether the basis for their diagnosis of Ms. Patteson as

---

[2] Confusingly, Defendant does not specify whether he seeks to challenge the Plaintiff's general and/or specific causation theory. The focus of Defendant's motion is related to Plaintiff's proposed general causation theories, i.e. whether Seroquel can cause TD, and Defendant makes some reference to not disputing specific causation for the purposes of this motion. Def. Mot., at 3, n. 2 ("There is a question as to whether Plaintiff actually suffered from TD. However, as that issue is a question of fact, it will not be addressed in the instant Motion."). Nonetheless, to err on the side of caution, Plaintiff will address the admissibility of her experts' opinions as to general, as well as specific causation, i.e. whether Plaintiff's doctors have a reliable basis for diagnosing *her* with Seroquel-induced TD.

suffering from TD was reliable.

On the first issue, whether medical studies and literature establish a connection between Seroquel and TD, this memorandum explains that peer-reviewed medical and scientific literature confirms the causal connection between Seroquel and TD, and this connection has been generally accepted in the medical community.  On the second issue, the admissibility of Plaintiff's causation witness testimony, we will demonstrate that her causation witnesses meet the necessary evidentiary requirements.  Plaintiff intends to call at least two witnesses on the issue of causation, Dr. Robert Rosenheck and Dr. Steven Lo. As a co-author of a landmark, peer-reviewed study on the effectiveness of antipsychotic mediation, Dr. Rosenheck is well-positioned to offer an opinion as to the causal connection between quetiapine and TD.[3]  (*See* Ex. A.)  Dr. Lo is a neurologist specializing in movement disorders,[4] of which TD is one example, and he diagnosed Ms. Patteson with TD caused by Seroquel in the course of treating her,

## II.     ARGUMENT

   A.   The Plaintiff's Expert's Opinions That Seroquel Can Cause TD Should Not Be Unfairly Excluded Because The Opinions Are Supported By Reliable Data.

The Defendant's original motion relied upon the *Frye* standard and other District of Columbia authorities. As we referenced above, however, *Daubert,* not *Frye*, applies, and "provides the standard for admitting expert scientific testimony in a federal trial." *Daubert*, 509 U.S. at 579, 585-97.  Accordingly, we will not address the *Frye* standard or

---

[3] The study, known as the "Clinical Antipsychotic Trials of Intervention Effectiveness" ["CATIE"], was published in the New England Journal of Medicine (September 22, 2005).  (Ex. A.)

[4] TD, a disease that causes uncontrollable facial and body movements, is characterized as a "movement disorder" by treating neurologists.

the other D.C. authorities cited in the Defendant's motion, but will instead analyze the admissibility of Plaintiff's causation testimony under Fed. R. Evid. 702, *Daubert*, and other federal authorities interpreting 702.

Fed. R. Evid. 702 provides that "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Ultimately, the sufficiency of a party's expert testimony opinion under Rule 702 and *Daubert* hinges on the opinion's "reliability" and "relevance." *See generally Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137 (1999) and *General Elec. Co.v. Joiner*, 522 U. S. 136, 143 (1997). Under *Daubert* and *Kumho*, Trial courts have wide discretion in deciding how to make this determination:

> . . . the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination. See *General Electric Co*. v. *Joiner*, 522 U.S. 136, 143 (1997) (courts of appeals are to apply "abuse of discretion" standard when reviewing district court's reliability determination).

*Kumho Tire*, 526 U.S. at 142. Additionally, *Daubert* lists four non-exhaustive factors for courts to consider in assessing reliability: (1) whether the theory at issue has been tested; (2) whether it has been subjected to peer review and publication; (3) whether there is a known error rate, and; (4) whether the proposed theory is generally accepted in the medical community. *Daubert*, 509 U.S. at 593-94.

The U.S. Court of Appeals for the District of Columbia has explained that the *Daubert* analysis does not establish a heightened threshold for the admission of expert evidence, so much as it focuses on the court's "gatekeeper" role as a check on "subjective belief and unsupported speculation." *Ambrosini v. Labarraque*, 101 F.3d 129, 134 (D.C. Cir. 1996). In other words, the effect of the *Daubert* opinion was to lower the threshold from the previous *Frye* standard for the admissibility of experts to conform with the Federal Rules of Evidence's more liberal theory of admissibility. *Id.*

In *Ambrosini*, a case involving a medication produced injury, our Circuit Court of Appeals reversed the trial court's exclusion of expert causation testimony. There, the Plaintiff proffered Dr. Allen Goldman to testify that the medication Depo-Provera caused a birth defect, the trial court deemed Goldman's testimony inadmissible under *Daubert*. Reversing the district court's dismissal, the Court relied on several factors in finding Dr. Goldman's testimony adequately reliable and admissible. The Court held that striking an expert's opinion under *Daubert* would be appropriate only when the methodology supporting the expert's opinion is "unconventional" or "improper." *Id.* at 136. Additionally, as further expressed in *Ambrosini*, this Circuit has not required that an expert provide evidence that "a statistically significant number of people have been injured" by a particular product for an expert to provide an admissible opinion that the product can cause a particular type of injury. *Id.* Rather, when an expert is concededly well-qualified in his or her field, the fact that a case may be the first of its type, or that the plaintiff's doctors may have been the first 'alert enough' to recognize a causal connection, should not preclude the admissibility of the expert's opinion. *Id.* Furthermore, this Circuit has held that an expert opinion is admissible as long as it is

5

sufficiently reliable, even when there are no epidemiological studies on point. *Id.*

Here, Plaintiff's expert testimony that Seroquel can cause TD is properly admissible because there is evidence from Dr. Rosenheck and one of Plaintiff's treating neurologists that establish the reliability of the data confirming the causal connection between Seroquel and TD.  As demonstrated by Dr. Rosenheck's affidavit, at least three of these four non-exhaustive criteria are met with respect to Seroquel and TD: (1) Seroquel and other second-generation antipsychotics ["SGA's"][5] causing TD has been studied – through CATIE and other studies; (2) CATIE was peer reviewed and published; and (3) it is generally accepted in the medical community that SGAs can and do cause TD. `

Additionally, the testimony of two of Plaintiff's causation witnesses arises directly from work they performed in their respective fields.  Their testimony and conclusions, which were not developed for purposes of litigation but rather arose out of either the treatment of Ms. Patteson or their own independent research, are explained in more detail below:

### a. Dr. Robert Rosenheck

Dr. Rosenheck is a Professor of Psychiatry and Public Health at Yale University School of Medicine.  He has conducted five major randomized clinical trials on the cost, effectiveness and side effects of antipsychotic medications and has published the results in the world's leading medical and psychiatric journals, including the *New England*

---

[5] Second-generation antipsychotics, such as Seroquel, were initially believed to carry less of a risk of neurological disorders than their first generation counterparts, and the SGAs' side effects were the subject of the aforementioned CATIE study.  As explained in more detail in Dr. Rosenheck's affidavit, one of the conclusions of the CATIE study was that the SGAs *do* also pose a risk of TD.

*Journal of Medicine*, the *Archives of General Psychiatry*, and the *American Journal of Psychiatry*. (Ex. A, at 4.) Most relevant to the issues in this case, Dr. Rosenheck was one of the co-authors of the CATIE study, which was the longest, largest comparative study of second-generation anti-psychotics.[6] As a result of analyzing the study's data as to whether Seroquel could cause TD, Dr. Rosenheck was able to conclude that, "the data, to a reasonable degree of medical and scientific probability establish a causal connection between quetiapine and the development of TD."[7] (Ex. A, at 11.) In addition to the CATIE study, Dr. Rosenheck identified one post-CATIE paper (Miller, 2008) that confirmed that Seroquel can cause TD. (Ex. A.)

Under the requirements of Rule 702 and *Daubert*, Dr. Rosenheck's testimony should be admitted because he is well-qualified to assist the trier of fact. His opinions are based on his familiarity with large-scale, rigorous scientific studies of the connection between quetiapine and TD, which should pass the "reliability" test under *Daubert*. (*See generally* Ex. A.)

      *b. Dr. Steven Lo*

Dr. Lo is a neurologist and movement disorder specialist who practices at the Georgetown University Movement Disorders Clinic, Georgetown University Hospital Department of Neurology. In March, 2008, after fully evaluating Plaintiff, Dr. Lo diagnosed Ms. Patteson with TD caused by ingestion of Seroquel. Dr. Lo is not a retained litigation consultant. He is one of Plaintiff's treating physicians who diagnosed

---

[6] Second-generation antipsychotics are often referred to as "atypical" anti-psychotics by those in the medical field. References to "atypical" or "second-generation" anti-psychotics should be understood as synonymous.

[7] Dr. Rosenheck extensively details data supporting this conclusion in his affidavit. (*See* Ex. A, at 9-11, 16-18.)

TD caused by Seroquel in his capacity as a treating physician.

Furthermore, Dr. Lo presented Plaintiff's case to the International Movement Disorders Society in July, 2009, and he explains in his affidavit how Seroquel and other similar drugs can cause TD. He stated, in part,

1. Tardive syndromes encompass a group of delayed-onset movement disorders induced by dopamine receptor blocking agents (DRBA). Current criteria include a history of at least 3 months' total cumulative exposure to a DRBA. It was first described in the 1950s, within 5 years after the first DRBA, chlorpromazine, became widely available. The abnormal involuntary movements most commonly affect the lower face (commonly referred to as TD), but have been reported to affect the limbs and trunk as well. In Kay's case, she used Seroquel for approximately 14 months.

2. The medical literature and studies have long documented a connection between dopamine receptor blocker medications and tardive syndromes. For example, Sigwald et al provided the first detailed description of TD in 1959, although the actual term TD was coined first by Faurbye et al in 1964. DRBAs are a well-known cause of drug-induced movement disorders, and psychiatrists commonly refer to these movement disorders collectively as "extrapyramidal symptoms." Tardive syndromes are well-published in both neurology and psychiatry journals. Well cited references and good reviews include:

    a. Fahn S. TDs. In: Matthews WB, Glaser GH, eds. *Recent Advances in Clinical Neurology*, Vol 4, Edinburgh: Churchill Livingstone; 1984: 229-260.
    b. Stacy M, Jankovic J. TD. *Curr Opin Neurol Neurosurg*, 1991; 4: 343-349.
    c. Jankovic J. Tardive syndromes and other drug-induced movement disorders. *Clin Neuropharmacol*, 1995: 18: 197-214.
    d. Fernandez HH, Friedman JH. Classification and treatment of tardive syndromes. *The Neurologist*, 2003; 9: 16-27. (Ex. B, ¶¶ 20, 21.)

In his affidavit, Dr. Lo further explained that he arrived at his diagnosis of Ms. Patteson in identifying that she had involuntary, choreic[8] movements in her lower extremities and trunk, i.e. involuntary, non-suppressible slow rocking repetitive movements. (Ex. B, ¶¶10-13.) She had no prior history of abnormal involuntary

---

[8] "Chorea" is defined as "the ceaseless occurrence of rapid, jerky involuntary movements." *Miller-Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health, Seventh Edition.* © 2003

8

movements prior to Spring 2007, and no family history of similar movement disorders. She had a history of taking one dopamine receptor blocker - Seroquel - for a fourteen month period.[9]  She had no history of exposure to other DRBAs.   Plaintiff had no history of psychiatric disorders.  A brain MRI from June 2007 showed no abnormal signals noted in her brain parenchyma (including the basal ganglia), no abnormal atrophy or shrinkage of the brain, and no abnormal enhancement after contrast was administered. (Ex. B.)

Consistent with methodology permissible under Rule 702(c), Dr. Lo thus made a differential diagnosis when he examined Ms. Patteson.  "Most circuits have held that a reliable differential diagnosis satisfies *Daubert* and provides a valid foundation for admitting an expert opinion. The circuits reason that a differential diagnosis is a tested methodology, has been subjected to peer review/publication, does not frequently lead to incorrect results, and is generally accepted in the medical community." *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000) (citing *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 262-63 (4th Cir. 1999)).

Dr. Lo described his approach to a differential diagnosis accordingly:

> The differential diagnosis methodology is long accepted and universally applied way for physicians to diagnose and treat patients. It involves the creation of a list of possible and/or most likely causes for a patient's signs and symptoms, based on his/her medical history, examination findings, and ancillary testing.

(Ex. B, ¶ 15.)[10]

---

[9] That Seroquel is a dopamine receptor blocker (DRB) is important because DRBs have long been known to cause TD.  (Ex. B.)

[10] Defendant Maloney correctly observes that a differential diagnosis using valid techniques is reliable, but he argues under the *Paoli* case that a differential diagnosis is invalid absent reliable evidence of general causation, and that no reliable evidence exists that Seroquel can cause TD.  However, the reality is that reliable evidence of general causation exists here, however, and this evidence is documented in the affidavits of Drs.

9

Additionally, as to the reliability of Dr. Lo's methodology, that the witness' methodology be reliably applied to the facts (Rule 702(d)), is also met. In describing his differential diagnosis process, Dr. Lo identified the possible causes that were included:

> Because chorea was the primary movement disorder on her examination, I considered the most important causes of new adult-onset chorea in my differential diagnosis. (Ex. B, ¶ 15.)

Dr. Lo then identified the four most likely causes of Ms. Patteson's chorea: (a) Huntington's disease; (b) Wilson's disease; (c) neuroacanthocytosis; and (d) tardive syndrome. He was then able, through objective testing, to definitively rule out Huntington's disease, Wilson's disease and neuroacanthocytosis, the other three possible explanations for Kay's symptoms. And, significantly, Ms. Patteson had a history of exposure to a DRB / neuroleptic medication – Seroquel. (Ex. B, ¶¶ 17-19.) Dr. Lo's careful differential diagnosis further supports the reliability of his opinion.

Dr. Lo's role as a treating physician is relevant to the analysis of the reliability of his opinions under *Daubert* inasmuch as he formed his opinions during his care of Ms. Patteson rather than developing his opinions in anticipation of litigation. As the *Ambrosini* court noted that an expert's stature and expertise in a given area is circumstantial evidence that the expert employed a scientifically valid methodology or mode of reasoning, Dr. Lo's credentials are highly relevant. 101 F.3d at 140 (*citing Joiner v. General Electric Co.*, 78 F.3d 524, 532 (11th Cir. 1996), *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1125 (9th Cir. 1994) and *United States v. Downing*, 753

---

Lo and Rosenheck.

F.2d 1224, 1239 (3rd Cir. 1985)). Dr. Lo's stature and experience with movement disorders is an indicia of reliability. (Ex. B., Dr. Lo's CV.)[11]

### B. "Adverse Events Reports" Tie Seroquel To TD

The federal Adverse Event Reporting System (AERS) is a computerized information database designed to support the FDA's post-marketing safety surveillance program for all approved drug and therapeutic biologic products. The FDA uses AERS to monitor for new adverse events and medication errors that might occur with these marketed products (source: http://www.fda.gov/Drugs/GuidanceComplianceRegulatory Information/Surveillance/Adv).

Adverse event reporting is voluntary. (*Id*.) The FDA receives some adverse event and medication error reports directly from health care professionals (such as physicians, pharmacists, nurses and others) and consumers (such as patients, family members, lawyers and others). Healthcare professionals and consumers may also report these events to the products' manufacturers. If a manufacturer receives an adverse event report, FDA regulations require the manufacturer to report this to FDA.

---

[11] *Ambrosini* also emphasized the fact that an expert's public presentation of a particular opinion can be viewed as circumstantial evidence of an expert opinion's reliability:

> That Dr. Goldman testified to his opinion of general causation in a public hearing, without any connection to the Ambrosinis' litigation, reduces concerns that Dr. Goldman is simply "a gun for hire." That he was called upon by the F.D.A. to testify on causation of birth defects suggests that he is recognized in his field and that he employs scientifically valid methodologies.

101 F.3d at 139-40. Here, similarly, Dr. Lo made a presentation of Plaintiff's case to the International Movement Disorder Society in July, 2009 and discussed his diagnosis of Seroquel caused TD.

11

Plaintiff submitted a Freedom of Information Act Request to the U.S. Department of Health and Human Services (USDHS), requesting Adverse Event Reports submitted for Seroquel.  In response, USDHS provided plaintiff with 21,000 page report of adverse event reports associated with Seroquel.  **Of these reports, approximately 970 involve reports of TD.**  (*See* Ex. C.)  This information is relevant to the reliability of the Plaintiff's experts' opinion that Seroquel can cause TD because courts have found that Adverse Event Reports can be relevant and admissible.  *See Bartlett v. Mutual Pharmaceutical Co., Inc.*, 678 F.3d 30, 39 (1st Cir. 2012) ("proof that a significant number of adverse reports exists is part of the calculus and surely relevant input for a witness who is prepared to opine on the risk-benefit ratio based on a range of considerations.")

    C.    <u>Defendant's Contention That Plaintiff's Expert Witnesses Do Not Know Of Another Case Of Never Seroquel-Induced TD Is Incorrect And Not Dispositive Of The Issue.</u>

Defendant argues that none of Plaintiff's medical witnesses have ever diagnosed a patient other than Plaintiff with Seroquel induced TD and that this somehow supports the concept that Seroquel does not cause TD.  Def. Mot., 19-23.  Though the D.C. Circuit Court of Appeals has previously stated that such evidence is not required for an expert's opinion to be reliable, *Ambrosini*, 101 F.3d at 136, Defendant's assertion is inaccurate.  Dr. Bose, Plaintiff's current treating Neurologist, testified that she has, in fact, treated another patient who had TD attributed to Seroquel.  Dr. Bose testified:

> Q. All right. When -- I don't want the name of the patient. When was -- when did you first begin treating the patient, as best you can recall?
>
> A. You know, I wasn't treating the patient for tardive, but I was deposed as a treating physician for some of the conditions the patient had.  And I – and I'm pretty sure the -- the diagnosis or the basic premise was Seroquel-

>induced tardive. Again, I'm not treating the patient for the tardive, it was just, you know, on the side, but that was one of my last depositions.

(Ex. D., Bose Dep. at 16-17).

Furthermore, in his affidavit, Dr. Rosenheck reports "at least two" published case studies specifically reporting TD among patients on Seroquel [Quetiapine-Related TD. S. Nassir Ghaemi, M.D.; James Y. Ko, A.B. Am J Psychiatry 2001;158:1737-1737; and Rizos E, Douzenis A, Gournellis R, Christodoulou C, Lykouras LP. TD in a patient treated with quetiapine. World J Biol Psychiatry 2009;10(1):54-7.]. (Ex. A.) Case studies are certainly an appropriate factor for consideration under *Daubert*. *Allison v. McGhan Medical*, 184 F.3d 1300, 1312 (11th Cir. 1999), *Rider* v. *Sandoz Pharmaceuticals Corp.*, 295 F.3d 1194, 1199 (11th Cir. 2002), even though, under *Daubert*, other evidence of causation may be equally or more persuasive.[12]

### D. Epidemiological Studies Are Not Necessary To Support An Expert's Opinion Under *Daubert*.

Defendant argues that epidemiological studies are the "gold standard" for reliability, citing two district court opinions (*In re Breast Implant Litigation*, 11 F.Supp. 1217, 1224-25 (D.Colo. 1998) and *Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 831 (D.C. Cir. 1988). Def. Mot., 11. Defendant then argues, that because epidemiological studies regarding Seroquel are lacking, Plaintiff's evidence must be precluded. Def. Mot., 28. Under *Daubert*, however, "epidemiological studies are not necessarily required to prove causation," and a proposed expert need only show that "the

---

[12] Defendant Maloney quotes deposition passages suggesting that Plaintiff's medical witnesses are not aware of literature linking Seroquel to TD. Def. Mot. at 23. It is far more accurate to say, however, that these witnesses did not recall, at the time of their deposition, specific literature they could then readily identify. In their affidavits, however, Plaintiff's causation witnesses have cited such literature, some of it extensive. (*See* Ex. A, Ex. B.)

methodology employed . . . in reaching his or her conclusion is sound." *Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378, 1384 (4th Cir. 1995). As discussed above, *Daubert*'s reliability inquiry is flexible and not based on any required set of factors.

Defendant incorrectly ascribes substantial weight to Dr. Rak's deposition testimony about AstraZeneca's *own* studies showing no causal connection between its own drug, Seroquel, and TD. Not only are epidemiological studies unnecessary to render an opinion admissible under *Daubert*, but Dr. Rosenheck's opinion as to the causal connection between Seroquel and TD is supported by multiple, sound scientific and medical studies. (Ex. A.) Indeed, Dr. Rosenheck stated that the suggestion that Seroquel has no relationship to TD or extrapyramidal symptoms[13] would be "jarring." (*Id.* at 16.) Dr. Rosenheck goes on to explain that "[a]lthough some unpublished studies relied on by the manufacturer appear to find no side effects of TD, these studies are inconsistent with other longer-term studies of TD and antipsychotic medication and most likely result from the fact that these studies were conducted with too short of a period of exposure." (*Id.*) In fact, Defendant Maloney provides no actual study evidence, other than Dr. Rak's conclusory testimony, and fails to provide *any* specifics such as how the studies were done, who did them, why they were done or how long they lasted. He does not address whether the studies were peer reviewed or published.

    E.    <u>Defendant Maloney's Motion Should Be Denied Because He has Previously Admitted That Seroquel Can Cause TD.</u>

Finally, the instant motion, seeking to prohibit any testimony that Seroquel can cause TD, is somewhat disingenuous in that Defendant Maloney has previously conceded

---

[13] Extrapyramidal symptoms, or EPS, is a generic term for the condition of involuntary muscle movements or spasms and encompasses the symptoms of TD.

14

that he was aware of the risk that Seroquel can cause TD. *Patteson v. AstraZeneca*, 876 F. Supp. 27, 35 (D.D.C. 2012) (noting that in his deposition, Maloney conceded that he was aware of the risk that Seroquel could cause TD). Admissions made during a deposition, absent exceptional circumstances, are binding on the parties as a judicial admission and cannot be challenged in the trial court or on appeal. *Cadle Co. II v. GPILP*, 441 Fed.Appx. 310, 313 (6th Cir. 2011). The effect of a judicial admission is to withdraw an issue from controversy. *Hoodoo v. Holder*, 558 F.3d 184, 190 (2nd Cir. 2009) (citing *Selimi v. INS*, 312 F.3d 854, 860 (7th Cir. 2002)).

Inasmuch as this Court previously recognized that Defendant Maloney admitted at his deposition that Seroquel can cause TD, Defendant's motion should be denied. Specifically, this Honorable Court specifically noted that,

> [I]n selections from Maloney's deposition that Plaintiffs cite, the doctor testifies that "the risk [of TD,] though present[,] was really very low," Opp., Exh. 5 (Maloney Dep.) at 69:13, and later, he again discusses the risk of neuromuscular problems, including TD, with Seroquel as "[r]are or infrequent." Id. at 72:9-12.
>
> While Maloney may have understood that the risk was low, he clearly understood that it nonetheless existed. See also id. at 176:17-177:9 (stating that, while second-generation antipsychotics are understood to carry lower risk of movement disorders, risk was not zero, and there was at least a possibility that a drug like Seroquel could cause TD).
>
> As the record unequivocally demonstrates that AstraZeneca expressly and clearly warned Maloney about the risk of TD – and that Maloney was in fact aware of this risk – AstraZeneca has satisfied its duty to warn Patteson's physician."

*Patteson*, 876 F. Supp. at 35. Accordingly, in light of Defendant Maloney conceding at his deposition that he was aware that Seroquel can cause TD, and that this Court has made a finding that Maloney was aware of the connection between Seroquel and TD, we submit that this issue should be withdrawn from

15

controversy, and that the Court should deny Defendant's motion.

## III. CONCLUSION

In light of the ample evidentiary basis supporting the reliability of the conclusion that Seroquel can cause TD, Plaintiff respectfully requests that the Court deny Defendant's motion to preclude Plaintiff's experts from testifying about the causal connection between Seroquel and TD.

Respectfully submitted,

/s/Kenneth M. Trombly
Kenneth M. Trombly, #199547
Schultz & Trombly, PLLC
1050 17th Street, NW Ste. 1250
Washington DC 20036
Email: kmt@schultztrombly.com
Phone: (202) 887-5000


/s/Timothy Aiken
Timothy Aiken, *Pro Hac Vice*
Aiken & Scoptur, SC
2600 North Mayfair Road Ste. 1030
Milwaukee, WI 53226-1308.
tim@aikenandscoptur.com
(414) 326-4979
*Attorneys for Plaintiffs*


/s/John P. Leader
John P. Leader
698 East Wetmore Rd., Suite 330
Tucson, AZ 85705
Email: john@leaderlawaz.com
Phone: (520) 575-9040

Certificate of Service

I hereby certify that on August 16, 2013, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing to the following CM/ECF registrants:

Gregory S. McKee, Esq. (of counsel)
Andrew E. Vernick, Esq.
Vernick & Associates, LLC
104 West Street
Annapolis, Maryland  21404
*Counsel for Defendant Maloney*

                /s/Kenneth M. Trombly
                Kenneth M. Trombly

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KAY PATTESON ) | |
| ) | Case No. 10-CV-01760-JEB |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| JOHN R. MALONEY, MD ) | |
| ) | |
| Defendant. ) | |

### ORDER

The Defendant having filed a motion to preclude Plaintiff's expert testimony that Seroquel can cause tardive dyskinesia, and it appearing that good cause for granting the motion is lacking, it is this ____ day of _____, 2013,

ORDERED, that the motion be and is hereby DENIED; and it is further

ORDERED, that Plaintiff's experts may offer opinions at trial as to the causal connection, if any, between Plaintiff's taking Seroquel and her developing tardive dyskinesia.

_____
JUDGE JAMES E. BOASBERG
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Copies to:
Kenneth M. Trombly
1050 17th Street, NW
Suite 1250
Washington, DC 20036
kmt@schultztrombly.com
*Attorney for Plaintiff*

Timothy Aiken
Aiken & Scoptur, SC
2600 North Mayfair Road
Milwaukee, WI 53226-1308
tim@aikenandscoptur.com
*Attorney for Plaintiff*

John P. Leader
3567 East Sunrise Drive
Suite 133
Tucson, AZ 85718
john@leaderlawaz.com
*Attorney for Plaintiff*

Gregory S. McKee, Esq. (of counsel)
Andrew E. Vernick, Esq.
Vernick & Associates, LLC
104 West Street
Annapolis, Maryland  21404
*Attorneys for Defendant Maloney*