# EXHIBIT F

Jeffrey Lieberman, MD
Chairman and Professor of Psychiatry
NYS Psychiatric Institute
1051 Riverside Drive
New York, NY 10032
212-543-5300

September 19, 2012

Gregory S. McKee, Esquire
Wharton, Levin, Ehrmantraut, & Klein, P.A.
104 West Street
P.O. Box 551
Annapolis, MD 21404-0551

Re: **Patteson v. Maloney, M.D.**

Dear Mr. McKee:

Please allow this correspondence to serve as a report of my opinions pertaining to the care and treatment of Kay Patteson by John Maloney, M.D. All the opinions contained herein are to a reasonable degree of medical probability based upon the national standard of care whether Dr. Maloney was reasonable and appropriate in his treatment of Kay Patteson.

By way of background, I obtained my medical doctorate degree in 1975 from George Washington University. From 1975 to 1979 I completed my internship and residency at St. Vincent's Hospital and Medical Center of New York, New York Medical College. Additionally, I completed the research fellowship at Bronx Psychiatric Center, Albert Einstein College of Medicine of New York, completing this in 1980. As it relates to my professional activities from 2005 to the present, I am the Psychiatrist and Chief at Columbia University Medical Center of New York Presbyterian Hospital and the Director of the New York State Psychiatric Institute. I am Chairman of the Department of Psychology at the College of Physicians and Surgeons, Columbia University. The rest of my appointments, presentations and research are contained within a copy of my Curriculum Vitae which you have been provided.

In addressing the issues in this case, I have reviewed the following materials:

1. Records of John Maloney, M.D.;
2. Records from Amy Friedenthal, M.D.;
3. Records from Georgetown University Hospital;
4. Records from Peter Bernad, M.D.;
5. Records from Potomac Hospital;
6. Records of Michael Cohen, M.D.;
7. Records of Ronald Sargent, M.D.;
8. Records of Steven Lo, M.D., Movement Disorder Clinic, Georgetown University Hospital;
9. Videos of Kay Patteson taken by Dr. Lo at Georgetown University Hospital;
10. Records of Jeff Jacobson, M.D.;
11. Records of Louis Levitt, M.D.;
12. Records of Sudeshna Bose, M.D.;
13. records from CVS Pharmacy;
14. Records from Safeway Pharmacy; and,
15. I have also reviewed various deposition transcripts, including that of Kay Patteson, Dr. Maloney, Dr. Bernad and Dr. Lo.

I. **Recitation of Facts**

Ms. Patteson is a 51 y.o. female whose first visit to see Dr. Maloney was on May 30, 2006. Along with her chief complaints of anxiousness and depression, Dr. Maloney also noted a significant history of alcohol abuse and dependence and medical h/o arthritis, asthma and hypertension. The patient also had periods of insomnia which were associated with her underlying conditions. She was given a working diagnosis of depression, anxiety and alcohol dependence. As a result, Dr. Maloney recommended an inpatient rehabilitation clinic for her alcoholism (which the patient declined) and medications (naltrexone and clonazepam) which were used to treat both alcohol and depression. However, the patient refused rehab treatment but subsequently agreed to attend AA.

The patient returned to Dr. Maloney's office on June 8, 2006. At that time, she stated that she was doing well on her medications but was still having difficulty sleeping. Dr. Maloney initially prescribed the medication trazodone for her insomnia, but also instructed the patient to take clonazepam instead of the trazodone if she found the first medication to be ineffective.

On June 22, 2006, the patient again returned to Dr. Maloney's office. At that time, she indicated to Dr. Maloney that thetrazodone was not effective. However, she did not take the clonazepam. Dr. Maloney elected to place Ms. Patteson on quetiapine, a second generation (atypical) antipsychotic medication.

2

Ms. Patteson continued to see Dr. Maloney throughout the remainder of 2006 and into 2007. During this period of time, she denied ethanol ingestion to Dr. Maloney and stated that she was doing well and that the medications (naltrexone and quetiapine) seemed to be effective in terms of reducing her ETOH craving, alleviating her anxiety and enabling her to sleep better.

On April 13, 2007 Ms. Patteson was noted to be limping and recommended to see an orthopedist. On June 5, 2007 she reported to Dr. Maloney that she was having some difficulty walking and was seeing a neurologist for this. Based upon the fact that she was seeing a neurologist, this physician elected to keep Ms. Patteson on the current medication regime and asked her to return to the office in approximately eight (8) weeks.

Ms. Patteson returned to Dr. Maloney's office on or about August 3, 2007. At that time, the patient reported having muscle spasms. Dr. Maloney initiated a plan to decrease the quetiapine with the intent of "tapering" the medication with the ultimate thought being to discontinue its use altogether and substitute zolpidem to treat her insomnia. Based upon the medical records and deposition testimony, it is my understanding that Dr. Maloney elected to do this secondary to the possibility that quetiapine may be contributing to her neuromuscular complaints. It is also my understanding that this information was communicated to the patient.

Approximately two days later, the patient saw her treating neurologist, Dr. Peter Bernad. It is my further understanding from my review of the records and depositions that a conversation took place between Ms. Patteson and Dr. Bernad about whether the quetiapine was having any impact on the neuromuscular difficulties that she was experiencing and that Dr. Bernad was "unsure."

The patient initially did well following discontinuation of quetiapine and reported that her mood was good, she was sleeping well and not abusing ETOH. However, she subsequently experienced a worsening of her neuromuscular symptoms and was hospitalized twice for complications in the fall of 2007.

Ms. Patteson began seeing other neurologists, as well as Dr. Steven Lo at Georgetown University Hospital in the Movement Disorder Clinic. The patient was ultimately diagnosed with a movement disorder that was suspected to be secondary to drug treatment in Janurary 2008 and continues to seek treatment to date.

II.  **Recitation of My Opinions As It Relates to This Case**

All of my opinions contained herein are to a reasonable degree of psychiatric/medical certainty. Additionally, they are based upon compliance of the national standard of care and based upon my education, training and experience, as well as my review of all the relevant medical records and

3

deposition testimony. I reserve the right to annotate my opinions as it is my understanding that discovery is ongoing. My opinions may be changed or modified based upon any additional materials that I receive. I am willing to more fully outline my opinions in the form of a deposition at the request of the Plaintiff and the convenience of everyone involved.

1. Dr. Maloney complied with the national standard of care in his prescription of quetiapine for this particular patient on June 22, 2006 based upon the fact that the patient had previously tried trazodone which was ineffective for her condition and had been recommended clonazepam. The administration of quetiapine was reasonable and appropriate under the circumstances for the Plaintiff's sleeping difficulties given her underlying clinical condition, which includes a significant history of alcohol abuse and dependence.

2. Dr. Maloney complied with the standard of care in the off-label prescription of quetiapine. This is a second generation (atypical) antipsychotic medication which is commonly prescribed for sleep disturbance. The standard of care does not require that the medication quetiapine be prescribed "on label." Dr. Maloney's decision making process in prescribing quetiapine is reflected in his medical notes and records, as well as in his deposition testimony, was both reasonable and appropriate under the circumstances. It is my further opinion, based upon my review of the medical records, as well as the relevant deposition testimony, that Dr. Maloney complied with the standard of care in giving the patient adequate informed consent if, as he said, his practice was to discuss possible adverse effects of the medication, including but not limited to, neuromuscular difficulties with his patients.

3. Dr. Maloney complied with the standard of care from his initial evaluation and treatment of Ms. Patteson on May 30, 2006, up to and including August 3, 2007 when he elected to "taper" the medication due to the possible relationship between the medication and the patient's new neuromuscular complaints. I believe that he appropriately addressed these neuromuscular complaints in a timely fashion and that his decision to taper the medication with the thought of eventually discontinuing it altogether was both reasonable and appropriate.

4. Dr. Maloney complied with the applicable standard of care in his treatment of Kay Patteson from the time that she initially presented with neuromuscular difficulties to him, until she discontinued treatment with him. This is based upon the fact

4

that the Plaintiff was being seen by a neurologist during this entire period of time and that Dr. Maloney deferred to the neurologist in the evaluation/treatment of the patient's neuromuscular complaints.

5. It is my opinion that quetiapine is a second generation (atypical) antipsychotic medication. The risks associated with a second generation atypical antipsychotic medication for movement disorders is relatively low. Quetiapine is also known as having the least risk of a second generation antipsychotic medication for neuromuscular side effects.

6. It is my further opinion that the clinical course of Ms. Patteson is not fully consistent with a quetiapine induced tardive dyskinesia. This is based in part upon the fact that Ms. Patteson exhibited a rather abrupt onset of her side effect syndrome at a relatively low dose of quetiapine and continued to have deteriorating neuromuscular difficulties and increasing chorea for a significant period of time following the discontinuation of the medication.

7. Based upon the patient's comorbidities, as well as her significant history of alcohol abuse and addiction, it is my opinion that Ms. Patteson does not have a normal life expectancy of an otherwise healthy Caucasian female.

8. It is my opinion that Dr. Maloney's overall evaluation, care and treatment of Ms. Patteson throughout the timeframe that he was her treating psychiatrist was appropriate and met the standard of care. This included the appropriate evaluation of her clinical condition, treatment modalities and recommendation for other forms of treatment.

I have also attached to this report a copy of my Curriculum Vitae, rate sheet to this report. I have not given testimony in any cases within the past four (4) years.

Should you have any questions or concerns, please do not hesitate to contact me.

Very truly yours,

Jeffrey Lieberman, M.D.

Enclosures